**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **LESLIE ROSEN, individually, on behalf of the Brookdale Hospital Medical Center 403(b) Plan, and on behalf of all similarly situated participants and beneficiaries of the Brookdale Hospital Medical Center 403(b) Plan,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ONE BROOKLYN HEALTH SYSTEM, INC. D/B/A BROOKDALE HOSPITAL MEDICAL CENTER; JOHN AND JANE DOES 1-30 IN THEIR CAPACITIES AS FIDUCIARIES;**<br><br>**Defendants.** | **CASE NO: 1:25-cv-6283**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

## I. INTRODUCTION

1. Plaintiff Leslie Rosen individually, as representative of the class, and on behalf of the Brookdale Hospital Medical Center 403(b) Plan ("the Plan") brings this action under 29 U.S.C. §§ 1132(a) (2) and (3) & 409(a) against Defendants (1) One Brooklyn Health System, inc. d/b/a Brookdale Hospital Medical Center ("Brookdale"), and (2) John and Jane Does 1-30 in their capacities as fiduciaries (collectively, "Defendants"), to remedy Defendants' breaches of fiduciary duties and other violations of the Employee Retirement Income & Security Act (ERISA), U.S.C. 29 1001, et seq.

2. As fiduciaries to the Plan, Defendants were always obligated to act prudently and for the exclusive benefit of participants and beneficiaries. These Defendants did not because they

consistently selected higher cost, lower-performing, investment options that reduced Plan participants' retirement funds as compared to readily available alternatives.

3. As a result of these breaches in fiduciary duty, Plaintiff and the proposed class suffered losses of millions of dollars.

4. To remedy Defendants' fiduciary breaches as further described below, Plaintiff brings this action individually and on behalf of the Plan to obtain the relief provided under ERISA § 409, 29 U.S.C. § 1109, for losses suffered by the Plan from November 10, 2019 to the date of judgment (the "Class Period") and for other appropriate equitable and injunctive relief under ERISA § 502(a)(3), 29 U.S.C. U.S.C. § 1102(a)(3).

## II. JURISDICTION AND VENUE

5. This Court has exclusive jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(a), 29 U.S.C. § 1132(a).

6. Venue lies in this district pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district in which the subject Plan is administered and where at least one of the alleged breaches took place.

7. As a Plan participant and holder of the disputed funds, Plaintiff has standing to bring claims on behalf of the Plan pursuant to 29 U.S.C. §1132(a)(2), as she is a participant seeking appropriate relief under 29 U.S.C. §1109.

8. Plaintiff has standing to bring claims on behalf of all holders of the disputed funds in the Plan because the alleged harms to holders of the funds can be traced to the same challenged conduct: the imprudent and disloyal process that Defendants used to select, monitor, and retain the disputed share classes and otherwise administer the Plan.

## III. THE PARTIES

### A. Plaintiff

9. Plaintiff Leslie Rosen brings this suit individually, on behalf of the Plan, and on behalf of a class of participants and beneficiaries of the Plan. At all relevant times, and during the Class Period, Plaintiff, by virtue of her employment with Brookdale and participation in the Plan, was a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

10. At all relevant times during the Class Period, Plaintiff was invested in the JPMorgan Smart Retirement 2020 investment option provided by the Plan.

11. As a result of Defendants' mismanagement of the Plan and violations of ERISA, Plaintiff was subject to excessive fees and underperformance and suffered financial losses.

### B. Defendants

12. One Brooklyn Health Systems, inc. d/b/a Brookdale Hospital Medical Center is a 402 NCL – not-for-profit-corporation that provides medical services in New York City.

13. Defendant is a New York not-for-profit corporation with its principal address at One Brookdale Plaza, Brooklyn, NY 11212.

14. Brookdale is the sponsor of the Plan per ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B); a party in interest under ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C); and a Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(2)(A), to the extent that it exercised discretion over the administration and management of the Plan and/or control of Plan assets.

15. At all relevant times, Brookdale was the Plan administrator under ERISA § 3(16), 29 U.S.C. § 1002(16); a party in interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A); and Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that it had or

exercised discretion over the administration or management of the Plan and/or control of Plan assets.

16. At all relevant times, Defendants John Does 1-30, as members of the Board of Directors, named as the governing body of the Plan Sponsor and Administrator, were parties-in-interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), and fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that they had or exercised discretionary authority respecting the administration or management of the Plan, and/or control of Plan assets. Plaintiff will seek leave to amend the Complaint to name each of these John Does once they ascertain their identities in discovery. John Does 1-30 will be referred to collectively as the "Defendants."

## IV. Defendants' Fiduciary Obligations

17. ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as Plan fiduciaries. The duties owed by an ERISA fiduciary to plan participants are the "highest known to the law." *See Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (citing Restatement (Second) of Trusts § 2 cmt. b (1959)). 29 U.S.C. §1104(a) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and – (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and like aims.

18. Under ERISA's duty of loyalty, Plan fiduciaries must exercise their discretion "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose" of "providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1) (emphasis added). This requires Plan fiduciaries to act with an "eye single" to the interests of Plan participants

and beneficiaries and to "exclude all selfish interest and all consideration of the interests of third persons." *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000) (citation omitted). Fiduciaries violate that duty when they make decisions even in part to benefit themselves or third parties.

19. ERISA further "supplements the fiduciaries' general duty of loyalty to the Plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc*., 530 U.S. 238, 241-42 (2000); *Cunningham v. Cornell Univ*., 145 S. Ct. 1020 (2025). Among these prohibited transactions, a fiduciary "shall not cause the plan to engage in a transaction" if the fiduciary "knows or should know" that it constitutes a "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" (29 U.S.C. § 1106(a)(1)(D)) and may not "deal with the assets of the plan in his own interest or for his own account" (29 U.S.C. § 1106(b)(1)).

20. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that: In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

21. Under 29 U.S.C. § 1132(a)(2), a plan participant is authorized to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part: Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## V. FACTUAL ALLEGATIONS

### A. The Plan

22. The Plan is a retirement plan within the meaning of 29 U.S.C. § 1002(2)(A), a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and a qualified plan under 26 U.S.C. § 401.

23. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA").

24. The Plan is a single-employer 403(b) plan and was established effective December 31, 2012. The Plan covers substantially all employees of Brookdale and its subsidiaries (the "Company"). The Company is the Plan sponsor and Administrator.

25. The Plan's assets are owned by and held in the name of the Plan, under the name "Brookdale Hospital Medical Center 403(b) Plan."

26. Defined contribution retirement plans are typically classified as: "Micro" plans (less than $5 million in assets); "Small" plans ($5 million to less than $50 million); "Mid" plans

($50 million to less than $200 million); “Large” plans ($200 million to less than $1 billion); and “Mega” plans (more than $1 billion).

27. The Plan qualified as a “Mid” plan from 2019-2023, and a “Large” plan in 2024. As of the Plan’s most recent Annual Return/Report of Employee Benefit Plan (Form 5500) filed in 2023, the Plan had $373,158,756 in assets and 4,794 total Plan participants.

28. The Plan currently offers mutual funds and common collective trust funds as investment options for participants.

29. Plan participants allocate their wages into the investment choices provided by the Committee. Participants own shares beneficially and have a recordkeeper account to track cash flows, gains, and losses.

30. Each participant can change investments each day, and participant allocations are updated every business day based on participant wage deposits, earnings, or account balances.

**B. Defendants Lacked a Prudent Process in Selecting and Retaining the Retail Share Class of JPMorgan SmartRetirement Target Date Fund.**

31. Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund.

32. Almost every mutual fund offers different share classes to investors. Generally, mutual funds offer at least “retail” and “institutional” share classes, among others.

33. Retail share classes of mutual funds are designed for small individual investors, while institutional share classes are designed for large and/or institutional investors. Retail share classes are identical to institutional share class funds in every respect, except for much higher fees.

34. Mutual fund companies generally try to compete for investment dollars by offering larger and/or institutional investors lower-cost share classes.

35. The Department of Labor has stated that "[i]nstitutional mutual funds typically charge lower expense ratios than do the retail funds with similar holdings and risk characteristics. One estimate is that the typical institutional fund has an expense ratio that is 50 basis points lower than comparable retail funds." U.S. Dep't of Labor Pension & Welfare Ben. Admin., Study of 401(k) Plan Fees and Expenses § 2.4.1.3 (Apr. 13, 1998).

36. The costs may differ among share classes, but the investment product is identical—the managers, investment styles, and stocks are not merely similar, but identical.

37. The principal difference between the share classes is that the mutual fund charges different fees based on the class chosen and negotiated by the investor. The mutual fund company is incentivized to sell the most expensive share class because it makes the most money with that product.

38. Lower-cost institutional share classes of mutual funds are available to institutional investors, like Brookdale.

39. Minimum investment thresholds for institutional share classes of a particular fund are routinely waived by the investment provider if the minimum not reached due to the retirement plan's total investment in the provider's platform.

40. Therefore, investment managers of large pools of assets make lower-cost share classes available for retirement plans of the Plan's size upon request, even if minimum investment thresholds were not satisfied.

41. Defendants had access to these low-cost institutional share classes of mutual funds. They either met the minimum investment requirements for these funds or had the option to negotiate with the investment provider to waive the minimum investment requirements.

42. Instead of monitoring and taking advantage of their leverage and negotiating lower cost share classes when purchasing fund shares, Defendants instead lazily and imprudently offered higher cost fund share classes as investment options for the Plan.

43. Thus, the Plan fiduciaries wasted Plan assets by failing to (1) monitor the available share classes, (2) select the lowest share class of the funds for inclusion in the plan menu, and/or (3) negotiate for a lower cost share class at any point following initial selection of the fund.

44. Defendants wasted money by failing to select the lowest-cost share class of the funds as the investment option for the Plan and by failing to switch to the lowest-cost share class at any point thereafter.

45. Defendants chose the JPMorgan SmartRetirement Fund as an investment option available to participants in or prior to 2014. Defendants chose to invest in share class "A" in 2014. The Plan's chosen share class "A" had an expense ratio ranging from 0.86 to 1.03. The next year, in 2015, other share classes such as the "R6" became available and had an expense ratio ranging from 0.05 to 0.67. The R6 share class was available to the Defendants and easily identifiable as it was disclosed in the JPMorgan SmartRetirement Fund's annual prospectus.

46. The following chart illustrates the differences between share class A (Defendant's chosen class) and the cheaper share class R6 with regard to expense ratios:

| ***Share Class & Expense Ratios per Plan Year*** | ***2024*** | ***2023*** | ***2022*** | ***2021*** | ***2020*** | ***2019*** | ***2018*** | ***2017*** | ***2016*** | ***2015*** | ***2014*** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ***JPMorgan SmartRetirement® 2025 Fund A*** | **0.79** | **0.78** | **0.82** | **0.84** | **0.85** | **0.85** | **0.85** | **0.84** | **0.84** | **0.89** | **0.95** |
| ***JPMorgan SmartRetirement® 2025 Fund R6*** | **0.35** | **0.34** | **0.38** | **0.41** | **0.43** | **0.47** | **0.47** | **0.52** | **0.52** | **0.60** | **#N/A** |

| *Share Class & Expense Ratios per Plan Year* | *2024* | *2023* | *2022* | *2021* | *2020* | *2019* | *2018* | *2017* | *2016* | *2015* | *2014* |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ***JPMorgan SmartRetirement® 2030 Fund A*** | **0.79** | **0.79** | **0.83** | **0.85** | **0.86** | **0.86** | **0.86** | **0.86** | **0.86** | **0.91** | **0.98** |
| ***JPMorgan SmartRetirement® 2030 Fund R6*** | **0.35** | **0.35** | **0.39** | **0.42** | **0.44** | **0.48** | **0.48** | **0.54** | **0.54** | **0.62** | **#N/A** |
| ***JPMorgan SmartRetirement® 2035 Fund A*** | **0.84** | **0.83** | **0.85** | **0.87** | **0.87** | **0.87** | **0.87** | **0.88** | **0.88** | **0.93** | **1.00** |
| ***JPMorgan SmartRetirement® 2035 Fund R6*** | **0.40** | **0.39** | **0.41** | **0.44** | **0.45** | **0.48** | **0.48** | **0.56** | **0.56** | **0.64** | **#N/A** |
| ***JPMorgan SmartRetirement® 2040 Fund A*** | **0.84** | **0.84** | **0.86** | **0.88** | **0.88** | **0.88** | **0.88** | **0.90** | **0.90** | **0.94** | **1.01** |
| ***JPMorgan SmartRetirement® 2040 Fund R6*** | **0.40** | **0.40** | **0.42** | **0.45** | **0.46** | **0.49** | **0.49** | **0.58** | **0.58** | **0.65** | **#N/A** |
| ***JPMorgan SmartRetirement® 2045 Fund A*** | **0.84** | **0.85** | **0.86** | **0.88** | **0.88** | **0.89** | **0.89** | **0.90** | **0.90** | **0.94** | **1.00** |
| ***JPMorgan SmartRetirement® 2045 Fund R6*** | **0.40** | **0.41** | **0.42** | **0.45** | **0.46** | **0.50** | **0.50** | **0.58** | **0.58** | **0.65** | **#N/A** |
| ***JPMorgan SmartRetirement® 2050 Fund A*** | **0.85** | **0.85** | **0.86** | **0.88** | **0.88** | **0.88** | **0.88** | **0.90** | **0.90** | **0.94** | **1.00** |
| ***JPMorgan SmartRetirement® 2050 Fund R6*** | **0.41** | **0.41** | **0.42** | **0.45** | **0.46** | **0.49** | **0.49** | **0.58** | **0.58** | **0.65** | **#N/A** |
| ***JPMorgan SmartRetirement® 2055 Fund A*** | **0.85** | **0.85** | **0.86** | **0.87** | **0.87** | **0.88** | **0.88** | **0.90** | **0.90** | **0.96** | **1.03** |
| ***JPMorgan SmartRetirement® 2055 Fund R6*** | **0.41** | **0.41** | **0.42** | **0.45** | **0.45** | **0.49** | **0.49** | **0.58** | **0.58** | **0.67** | **#N/A** |

| ***Share Class & Expense Ratios per Plan Year*** | ***2024*** | ***2023*** | ***2022*** | ***2021*** | ***2020*** | ***2019*** | ***2018*** | ***2017*** | ***2016*** | ***2015*** | ***2014*** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ***JPMorgan SmartRetirement® 2060 Fund A*** | **0.85** | **0.84** | **0.86** | **0.86** | **0.86** | **0.88** | **0.88** | **0.90** | **0.90** | **#N/A** | **#N/A** |
| ***JPMorgan SmartRetirement® 2060 Fund R6*** | **0.41** | **0.40** | **0.42** | **0.44** | **0.44** | **0.49** | **0.49** | **0.58** | **0.58** | **#N/A** | **#N/A** |
| ***Jpmorgan Smartretirement 2065 Fund A*** | **0.86** | **0.88** | **0.86** | **#N/A** | **#N/A** | **#N/A** | **#N/A** | **#N/A** | **#N/A** | **#N/A** | **#N/A** |
| ***Jpmorgan Smartretirement 2065 Fund R6*** | **0.42** | **0.44** | **0.42** | **#N/A** | **#N/A** | **#N/A** | **#N/A** | **#N/A** | **#N/A** | **#N/A** | **#N/A** |
| ***JPMorgan SmartRetirement® 2020 Fund A*** | **0.75** | **0.75** | **0.78** | **0.80** | **0.80** | **0.80** | **0.81** | **0.81** | **0.81** | **0.81** | **0.86** |
| ***JPMorgan SmartRetirement® 2020 Fund R6*** | **0.34** | **0.34** | **0.37** | **0.40** | **0.41** | **0.41** | **0.45** | **0.45** | **0.50** | **0.50** | **0.55** |

47. As seen in the above chart, the A share class had an expense ratio more than doubled that of the R6 share class.

48. Despite the availability and identifiability of the cheaper institutional share class, Defendants consistently chose to retain investments in share class "A" during the class period. During that time frame, the expense ratio for the "A" class ranged from 0.79 to 0.89, while the expense ratio for the R6 share class ranged from 0.34 to 0.50.

49. The R6 share class had only a $5 million minimum for retirement plans that Brookdale could have easily met, or alternatively, Brookdale could have easily negotiated a waiver of the minimum.

50. Assuming arguendo that Defendants could not meet or succeed in waiving the minimum investment requirement for the R6 share class, there were other, cheaper share classes

of the same fund available, including the R5, R4, and I share classes. Those share classes were progressively worse than the R6 share class, but still much better than the A share class. Those share classes were **available at no minimum investment for retirement plans.**

51. The fact that Defendants didn't switch to the best or any of the better share classes is a testament to their lack of process in evaluating and selecting/changing share classes.

52. Defendants still have not corrected their imprudent decision to offer share class "A" instead of the identical but cheaper share class "R6." Defendants' failure to monitor and evaluate available share classes reflects Defendants' imprudent or absent processes in evaluating and retaining investment share classes for the Plan.

53. These lower-cost share classes of the identical mutual funds for the Plan have been available for years, some dating back to 2015 or before. At all times, Defendants knew or should have known about the differences in share classes and that a superior alternative investment was readily available. An adequate investigation, or even a simple review of the funds' prospectuses under consideration, would have uncovered the prudent alternative.

54. It is inexplicable how this grievous share class selection error persisted in the plan for over a decade, and is indicative of an imprudent process or no process at all in reviewing and monitoring share class selections.

55. Defendants breached their fiduciary duties by forcing participant funds into a share class that cost more than twice as much as the cheapest available share class.

56. The failure to select far lower-cost share classes for the Plan's mutual fund options—share classes that are identical in all respects (portfolio manager, underlying investments, and asset allocation), except for cost—demonstrates that Defendants acted imprudently.

57. At a minimum, Defendants failed to consider the size and purchasing power of the Plan when selecting share classes and failed to engage in a prudent process for the selection, monitoring, and retention of share classes of mutual funds.

58. Had the amounts invested in the higher-cost share class mutual fund options instead been invested in the lower-cost share class mutual fund options, the Plan's participants would have at least $4 million more today.

**C. Defendants Lacked Prudent Process in Selecting and Retaining Share Classes on a Plan-Wide Basis**

59. Unfortunately, Defendants' failure to implement and abide by prudent process extended far beyond the JPMorgan target date fund investment.

60. Defendants also failed to investigate and select cheaper and therefore better[1] share classes for their investments.

61. The following fund options all had more prudent share classes available that charged less for an identical product at the time of selection: Carillion Scout Mid Cap I[2]; Invesco Developing Markets A[3]; and JPMorgan Equity I[4];

[1] Again, aside from the cost, the products are identical on the share class level.

[2] Throughout the class period, Carillion Scout Mid Cap I was on average more expensive than Carillion Scout Mid Cap R6 that should have been selected or changed to during the class period.

[3] Throughout the class period, Invesco Developing Markets A was on average more expensive than Invesco Developing Markets R6 that should have been selected or changed to during the class period.

[4] Throughout the class period, JPMorgan Equity I was on average more expensive than JPMorgan Equity R5 and 25 basis points more expensive than JPMorgan Equity R6 that should have been selected or changed to during the class period.

**Expense Ratios and Minimums at the time of Selection**

| Expense Ratio | Minimums | | Name | Symbol |
|---|---|---|---|---|
| 1.99 | 1000 | | Carillon Scout Mid Ca; | CSMFX |
| 1.56 | 0 | | Carillon Scout Mid Ca; | CSMRX |
| 1.26 | 1000 | | Carillon Scout Mid Ca; | CSMZX |
| 1.20 | 1000 | | Carillon Scout Mid Ca; | CSMEX |
| 1.00 | 0 | | Carillon Scout Mid Ca; | CSMSX |
| **0.98** | **10000** | **Brookdale** | **Carillon Scout Mid** | **UMBMX** |
| 0.88 | 0 | Best share class | Carillon Scout Mid Ca; | CSMUX |

| Expense Ratio | Minimums | | Name | Symbol |
|---|---|---|---|---|
| 2.00 | 1000 | | Invesco Developing Mar | ODVCX |
| 1.50 | 0 | | Invesco Developing Mar | ODVNX |
| **1.24** | **1000** | **Brookdale** | **Invesco Developing** | **ODMAX** |
| 1.00 | 1000 | | Invesco Developing Mar | ODVYX |
| 0.88 | 1000000 | | Invesco Developing Mkt | DVMFX |
| 0.83 | 1000000 | Best Share class | Invesco Developing Mkt | ODVIX |

| Expense Ratio | Minimums | | Name | Symbol |
|---|---|---|---|---|
| 1.47 | 1000 | | JPMorgan Equity Incoı | OINCX |
| 1.23 | 0 | | JPMorgan Equity Incoı | OIEFX |
| 0.98 | 1000 | | JPMorgan Equity Incoı | OIEIX |
| 0.97 | 0 | | JPMorgan Equity Incoı | OIEPX |
| **0.72** | **1,000,000.00** | **Brookdale** | **JPMorgan Equity I** | **HLIEX** |
| 0.72 | - | | JPMorgan Equity Incoı | OIEQX |
| 0.57 | - | | JPMorgan Equity Incoı | OIERX |
| 0.47 | 15,000,000.00 | Brookdale invested enough, minimum typically waived for qualified retirement plans (QRP) and | JPMorgan Equity Incoı | OIEJX |

62. There are likely other funds affected funds as well because the same flawed process was applied across the entire plan Plan, but this information is not available for all funds at this time.

63. Defendants continued to overpay for the identical products with Participant money for these funds.

**Expense Ratios 2013-2024**

| | 2024 | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carillon Scout Mid Cap Fund Class I | 0.95 | 0.96 | 0.95 | 0.97 | 0.98 | 0.98 | 1.03 | 1.04 | 1.04 | 1.02 | 1.07 | 1.07 |
| Carillon Scout Mid Cap Fund Class R-6 | 0.85 | 0.86 | 0.86 | 0.88 | 0.88 | 0.90 | 0.93 | #N/A | #N/A | #N/A | #N/A | #N/A |
| | | | | | | | | | | | | |
| Invesco Developing Markets Fund Class A | 1.26 | 1.24 | 1.20 | 1.22 | 1.24 | 1.26 | 1.29 | 1.32 | 1.32 | 1.32 | 1.30 | 1.30 |
| Invesco Developing Markets Fund Class R6 | 0.88 | 0.84 | 0.81 | 0.82 | 0.83 | 0.85 | 0.87 | 0.88 | 0.88 | 0.86 | 0.86 | 0.86 |
| | | | | | | | | | | | | |
| JPMorgan Equity Income Fund Class I | 0.70 | 0.70 | 0.70 | 0.71 | 0.72 | 0.75 | 0.75 | 0.75 | 0.79 | 0.79 | 0.80 | 0.80 |
| JPMorgan Equity Income Fund Class R6 | 0.45 | 0.45 | 0.45 | 0.46 | 0.47 | 0.50 | 0.50 | 0.50 | 0.50 | 0.51 | 0.55 | 0.55 |

64. Investing Plan assets in higher share classes harms the Plan's participants because it causes them to pay excess indirect fees, which are not tethered to any service value provided to Plan participants but rather are tied to the amounts invested by Plan participants. Because the Plan could have invested in identical mutual funds with a lower share class expense ratio, Defendants' actions were directly erosive to the Plan's growth. Defendants caused Plaintiff and other Plan participants/beneficiaries harm by not only forcing them to pay higher fees, but also causing lost yield and returns due to the higher fees on the majority of investments offered through the Plan. The erosive effect of excessive fees and the resulting lost returns compound over time, substantially lowering the corpus of participants' retirement investments.

65. In selecting share classes with a higher fee, Defendants demonstrated a lack of prudence when selecting and retaining investments. A prudent fiduciary must have a viable methodology to monitor and should easily spot the best share class options for the Plan.

66. As stated by the SEC Office of Compliance Inspections and Examinations, a fiduciary investment advisor "has failed to uphold its fiduciary duty when it causes a client to

purchase a more expensive share class of a fund when a less expensive class of that fund is available."[5]

67. Here, less expensive share classes of the Plan funds were available. At a minimum, Defendants could have obtained cheaper share classes of identical funds with a few simple phone calls.

68. The Plan offered and maintained higher cost share classes when identical lower cost class shares of the same mutual funds were available. Simply put, given the choice of two identical investments—with the same assets, investment style, and management—Defendants inexplicably chose the more expensive product. Defendants thus caused Plan participants/beneficiaries harm by forcing them to pay higher fees and causing lost yield and returns they rely on for retirement income. In doing so, Defendants undermined the very purpose of the Plan: to provide income security for participants/beneficiaries.

69. If Defendants had implemented and followed a prudent process when selecting and retaining share classes for Plan funds, then Plan participants would have millions more dollars in the Plan today.

**D. Defendants Demonstrated Disloyalty Through Their Actions**

70. Alternatively, or concurrently with the lack of prudent process, Defendants' share class selections for the Plan were not only imprudent, but also benefited Defendants and third parties, which requires the inference of disloyalty.

[5] "OCIE's 2016 Share Class Initiative", National Exam Program Risk Alert, Securities and Exchange Commission, Office of Compliance Inspections and Examinations, July 13, 2016, available at https://www.sec.gov/ocie/announcement/ocie-risk-alert-2016-shareclass-initiative.pdf.

71. Across the Plan, Defendants agreed to revenue-sharing arrangements that allowed Defendants to avoid spending time on paying for necessary administrative services at an increased cost to the participants. This trade-off is neither prudent nor loyal.

72. On their annual 5500 form, Defendants disclose that they make payments based on basis points of the investment back to service providers like Transamerica, National Financial Services, and Mid Atlantic Capital Corporation. These agreements are highly profitable for service providers, as they receive a percentage of the participants' total investments, plus their biweekly wage savings and matching contributions, which greatly surpass what they would have earned from charging each participant a flat quarterly fee that never increases.

| Fund Family | Fund Name | Start Date | End Date | Revenue to Transamerica Retirement Solutions | Revenue to National Financial Services | Revenue to Mid Atlantic Capital Corporation |
|---|---|---|---|---|---|---|
| CARILLON | CARILLON SCOUT MID CAP I | 1/1/2023 | 12/31/2023 | 38.800 | 1.200 | |
| INVESCO | INVESCO DEVELOPING MARKETS A | 1/1/2023 | 12/31/2023 | 48.500 | 1.500 | |
| JP MORGAN | JP MORGAN SMARTRETIREMENT 2055 | 1/1/2023 | 12/31/2023 | 48.500 | 1.500 | |
| JP MORGAN | JPMORGAN EQUITY INCOME I | 1/1/2023 | 12/31/2023 | 24.250 | 0.750 | |
| JP MORGAN | JPMORGAN SMARTRETIREMENT 2020 | 1/1/2023 | 12/31/2023 | 48.500 | 1.500 | |
| JP MORGAN | JPMORGAN SMARTRETIREMENT 2025 | 1/1/2023 | 12/31/2023 | 48.500 | 1.500 | |
| JP MORGAN | JPMORGAN SMARTRETIREMENT 2030 | 1/1/2023 | 12/31/2023 | 48.500 | 1.500 | |
| JP MORGAN | JPMORGAN SMARTRETIREMENT 2035 | 1/1/2023 | 12/31/2023 | 48.500 | 1.500 | |
| JP MORGAN | JPMORGAN SMARTRETIREMENT 2040 | 1/1/2023 | 12/31/2023 | 48.500 | 1.500 | |
| JP MORGAN | JPMORGAN SMARTRETIREMENT 2045 | 1/1/2023 | 12/31/2023 | 48.500 | 1.500 | |
| JP MORGAN | JPMORGAN SMARTRETIREMENT 2050 | 1/1/2023 | 12/31/2023 | 48.500 | 1.500 | |
| JP MORGAN | JPMORGAN SMARTRETIREMENT INC | 1/1/2023 | 12/31/2023 | 48.500 | 1.500 | |
| METROPOLITAN WEST ASSET | METRO WEST TOTAL RETURN, I | 1/1/2023 | 12/31/2023 | 9.700 | 0.300 | |
| PRUDENTIAL | PRUDENTIAL GUARANTEED INC FUND | 1/1/2023 | 12/31/2023 | 14.438 | | 0.563 |

73. However, this scheme increases the costs to participants and reduces their funds available for investment. This is true because revenue sharing is tied to higher-cost share classes. More money is paid in fees, reducing the amount invested.

74. This type of agreement benefits everyone **except** the participants: (1) the employer gets to spend less time and money on plan expenses, as they are automatically withheld and shuffled from provider to provider, and (2) the providers gain a windfall they could not make charging a reasonable fee per participant, all while (3) participants are burdened with higher fees and fewer dollars available for investment. Even if the revenue-sharing credits were passed

through to participants, they would not make up for the money lost due to growth, time in the market, and higher investment costs.

75. In essence, Defendants' actions here suggest that Defendants chose to prioritize the bottom line of the Company and the third-party providers rather than participants.

76. But Defendants' duty of loyalty required them to act in the exclusive interest of the participants **and to defray expenses**. By failing to do so, Defendants breached their duty of loyalty.

77. At a minimum, Defendants' actions here raise the inferences of self-dealing, disloyalty, and failure to defray expenses.

78. This is true not only for the JPMorgan SmartRetirement target fund investment, but also for Carillon Scout Mid Cap I, Invesco Developing Markets A, JPMorgan Equity Income I, Metro West Total Return I, Prudential Guaranteed Inc Fund, each of which also had revenue sharing agreements that hurt the participants and benefitted Defendants and third party service providers in the same way.

79. The prevalence of these agreements in this Plan speaks volumes about where Defendants' loyalties truly lie. Defendants consistently prioritize their own interests and those of the interested third-party service providers over those of the Plan participants.

80. As a result, Plaintiff and the Plan lost millions of dollars plan-wide, and approximately at least $4 million across the JPMorgan SmarRetirement Target fund investment alone.

## VI. CLASS ALLEGATIONS

81. 29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

82. As an alternative to direct individual actions on behalf of the Plan, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan.

83. Plaintiff brings this action on behalf of herself and the Class, which is defined as: participants in and beneficiaries of the Plan but excluding Defendants; any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of or is or was a partner, officer, director, or controlling person of, the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of; Plaintiffs' counsel; judges of the Court in which this case is pending and their current spouse and children; and the legal representatives, heirs, successors and assigns of any such excluded person.

84. The members of the Class are so numerous, consisting of thousands of members, not including their spouse beneficiaries, who, upon information and belief, are sufficiently dispersed geographically such that joinder of all members is impracticable. The issues of liability are common to all members of the Class and are capable of common answers as those issues.

85. Plaintiff's claims are typical of the claims of other members of the Class because her claims arise from the same events, practices and/or courses of conduct described above.

86. Plaintiff's claims are also typical of the claims of other members of the Class because the relief sought consists of requiring Defendants to make the Plan whole for any losses caused by their fiduciary breaches and to disgorge their profits to the Plan. Any such recovery from Defendants will be paid to the Plan and any relief will flow to all Class Members through their accounts in the Plan.

87. Plaintiff will fairly and adequately represent and protect the interests of the Class.

88. Plaintiff does not have any interests antagonistic to or in conflict with those of the Class.

89. Defendants have no unique defenses against Plaintiffs that would interfere with Plaintiffs' representation of the Class.

90. Plaintiff is represented by counsel experienced in prosecuting ERISA class actions and with experience and expertise in litigation involving ERISA breaches of fiduciary duty and ERISA prohibited transactions.

91. The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and its participants. This action challenges whether Defendants acted consistently with their obligations under ERISA as to the Plan as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

92. The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants engaged in imprudence with respect to the Plan and fulfilled their fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

93. The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to the Class as a whole. This action challenges whether Defendants engaged in breaches of fiduciary duties which would be violations

of ERISA as to the Plan as a whole and as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendants breached their fiduciary duties. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief that would either flow directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief.

94. The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants breached their fiduciary duties to the Plan. As the members of the Class were participants in that Plan, their accounts were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

95. A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings, and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation, which might result in inconsistent judgments about Defendants' duties to the Plan.

96. The following factors set forth in Rule 23(b)(3) also support certification: a. The members of the Class have an interest in a unitary adjudication of the issues presented here for the reasons that this case should be certified under Rule 23(b)(1). b. No other litigation concerning this controversy has been filed by any other members of the Class. c. This District is the most

desirable location for concentrating this litigation because (i) Plaintiff is located in this District; (ii) Brookdale does business in this District; and (iii) a significant number of Class members are located in this District. d. There are no anticipated difficulties in managing this case as a class action.

97. Additionally, or in the alternative, this action may be certified as to particular issues under Rule 23(c)(4), including but not limited to Defendants' liability to the Class for their allegedly imprudent and disloyal conduct.

## VII. TIMELINESS

98. Within the six-year period prior to Plaintiff filing this suit, Defendants violated one or more of their fiduciary obligations as described above.

99. At all relevant times during the Class Period, Defendants also made affirmative misrepresentations to participants about the security of their investments, the competence of the portfolio fund managers, the performance history of their investments, and the amount of investment fees they were being charged.

100. At all relevant times during the Class Period, Defendants intentionally concealed their fiduciary breaches to prevent Plan participants from discovering them and avoiding the need to cure the deficiencies.

101. Plaintiff did not acquire actual knowledge of these violations until shortly before commencing this action.

102. Consequently, Plaintiff's claims in this action are timely under 29 U.S.C. § 1113.

**COUNT I: Breach of Fiduciary Duty of Prudence**
**(against all Defendants)**

103. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

104. At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar as they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

105. ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments, as well as in the monitoring and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

106. As fiduciaries of the Plan, Defendants were subject to the duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aim.

107. At all relevant times during the Class Period, Defendants breached their fiduciary duty of prudence in multiple respects as discussed above.

108. Based on reasonable inferences from the facts set forth in this Complaint, at all relevant times during Class Period, Defendants failed to have a proper system of review in place to ensure, among other things, that: (a) their selection and retention of investment options were prudent; and (b) Plan expenses were reasonable and necessary.

109. At all relevant times during the Class Period, Defendants did not have adequate procedures in place to monitor investments and did not act in the best interests of the Plan participants. As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants suffered millions of dollars in losses. Had Defendants complied with their fiduciary

obligations, the Plan would not have suffered these losses, and Plan participants would have had more funds available to them for their retirement.

110. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties and must restore any profits resulting from such breaches.

111. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

**COUNT II: Breach of the Fiduciary Duty of Loyalty**
**(against all Defendants)**

112. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

113. At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

114. ERISA fiduciaries owe a duty of loyalty. 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty requires fiduciaries to act "for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." *Id.*

115. The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

116. "Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and

beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988).

117. At all relevant times during the Class Period, Defendants breached their fiduciary duty of loyalty in multiple respects as described above by consistently choosing worse investment share classes for the Plan participants in exchange for revenue share benefits for Defendants and third parties.

118. Defendants failed to only act with the exclusive purpose of providing benefits to participants by allowing revenue share, unnecessary costs, and excessive costs diminish Plan participants retirement funds.

119. Defendants failed to defray expenses by allowing revenue sharing, unnecessary costs, and excessive costs diminish Plan participants retirement funds.

120. Defendants failed to act with the exclusive purpose of providing benefits to participants by choosing economically unfavorable options in exchange for revenue share benefits that benefited Defendants and third parties at the expense of the participants.

121. As a direct and proximate result of Defendants' breaches of this fiduciary duty, the Plan and its participants suffered millions of dollars in losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

122. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches.

123. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

**COUNT III: Breach of Co-Fiduciary Duties**
**(against all Defendants)**

124. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

125. ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary unless he makes reasonable efforts under the circumstances to remedy the breach.

126. Each Defendant had the data and information available to them to discover or stop the fiduciary breaches alleged herein.

127. Each Defendant knew and had the necessary data and information available to them to know of opportunities for better performing investments.

128. Nevertheless, each Defendant chose to ignore, acquiesce, or participate in the ongoing breaches of fiduciary duty.

129. Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims, and request that the Court order or award the following relief:

A. Find and adjudge that the Defendants have breached their fiduciary duties, as described above;

B. Find and adjudge that the Defendants are personally liable to make good to the Plan the losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

C. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint the Plaintiff as class representative, and appoint the law firm of Milberg, PLLC as class counsel;

D. Order Defendants to disgorge any profits they received as a result of the above breaches of fiduciary duty;

E. Impose a constructive trust over these profits;

F. Order the Defendants to make good to the Plan the losses resulting from each breach of fiduciary duty and to restore to the Plan any profits resulting from each breach of fiduciary duty;

G. Impose surcharge against the Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA

H. Apportion all amounts recovered for the Plan among the Plaintiffs and the Class;

I. Order that any amount to be paid to the Plan and/or accounts of Plaintiff and Class members can be satisfied by using or transferring any breaching fiduciary's account (or the proceeds of that account) to the extent of that fiduciary's liability;

J. Require Defendants to pay attorneys' fees and the costs of this action pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), or order the payment of reasonable fees and expenses to Plaintiff's counsel on the basis of the common benefit or common fund doctrine (or other applicable law) out of any money or benefit recovered for the Class in this action;

K. Award pre-judgment and post-judgment interest; and

L. Award any other such relief the Court determines Plaintiff and the Class are entitled to pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).

Dated: November 11, 2025

Respectfully submitted,

/s/ *Vicki J. Maniatis*__________
Vicki J. Maniatis (NY Bar: 2578896)
**MILBERG, PLLC**
405 East 50th Street
New York, NY 10022
Tel: (516) 491-4665
vmaniatis@milberg.com

Alexandr Rudenco*
Arlene Boruchowitz*
**MILBERG, PLLC**
800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
arudenco@milberg.com
aboruchowitz@milberg.com

**Pro Hac Vice Application forthcoming*

*Counsel for Plaintiffs and the Prospective Class*